88 So.2d 302 (1956)
VOLUSIA DISCOUNT COMPANY, Inc., a Corporation, Appellant,
v.
ALEXANDER K-F MOTORS, a Division of Kaiser Fraser Sales Corporation, Appellee.
Supreme Court of Florida, Division A.
May 25, 1956.
Rehearing Denied July 5, 1956.
*303 Raymond, Wilson & Karl, Daytona Beach, for appellant.
Hull, Landis, Graham & French, Daytona Beach, for appellee.
THORNAL, Justice.
Appellant Volusia Discount Company, Inc., which was defendant below, seeks reversal of a summary judgment awarding damages to appellee Alexander K-F Motors, plaintiff below, in a replevin proceeding.
The question presented by the appeal is the correctness of the ruling of the trial judge awarding a summary judgment in favor of the appellee.
The record reveals that one R.A. Heptinstall, Sr., d/b/a T. & H. Motors, was the local dealer in DeLand, Florida, for Henry J automobiles. Alexander K-F Motors was the distributor for such automobiles in Jacksonville. On August 3, 1953, Heptinstall ordered two new cars from the distributor and obtained a complete description of the automobiles by telephone, including model, serial number and motor number. On the same day he executed and delivered to Volusia Discount Company a promissory note and a trust receipt which contained the detailed description of the automobiles. The Discount Company thereupon paid over to Heptinstall an amount approximately equal to the wholesale price of the cars. Two days later Heptinstall went to Jacksonville, obtained the two automobiles and received from the distributor an invoice which, in the automobile trade, evidences transfer of title and which said invoice showed on its face that the cars were delivered to Heptinstall on the basis of "cash on delivery." The dealer gave the distributor his check for the purchase price and took possession of the automobiles, returned them to DeLand and exhibited the invoice to the Discount Company. The distributor deposited the dealer's check on August 8, 1953, and on August 11 the drawee bank returned it because of insufficient funds. The check was redeposited and again returned for the same reason on August 17. On August 27, at the request of the distributor, the dealer issued a new check to replace the first check. The second check was returned because of insufficiency of funds on August 29.
On August 14, 1953, the dealer by telephone ordered a third Henry J and followed the identical procedure with the Discount Company and the distributor. On August 19 the dealer gave his check to the distributor, and received the third car. This check having been deposited on August 21 was likewise returned for insufficiency of funds on August 29. On August 29, the dealer Heptinstall defaulted on the loans that he procured from the Discount Company on the three automobiles and on that date the Discount Company took possession of the automobiles under the trust receipts and later sold them to innocent purchasers for value.
The deposition of the dealer is to the effect that the distributor knew that he (the dealer) was in financial difficulties, that they were extending credit to him for the automobiles by agreeing to withhold the deposit of his checks for several days on each occasion, *304 that they had known for several months that he was in financial trouble and further that when he ordered the cars by telephone, he advised the distributor's representatives that he needed detailed information with reference to the cars in order to "floor plan" them with the Discount Company. The wholesale manager of the distributor, by deposition, denied that the distributor's representative was informed in the telephone conversations that the dealer expected to "floor plan" the cars. He did concede, however, that as far as the distributor was concerned, after delivery of the checks, the dealer could sell the automobiles to a customer and that once the dealer took possession of an automobile and had paid for it, their assumption was that the car "was paid for and gone." He further stated that as far as they were concerned the dealer's check "was legal tender for an automobile."
On September 2, 1953, the distributor instituted replevin proceedings against the dealer and the Discount Company in an effort to repossess the three automobiles. The evidence showed that the cars had been sold and in lieu of a judgment awarding possession to the distributor, the trial judge granted the distributor's motion for the summary judgment against the Discount Company and the dealer for an amount equal to the value of the automobiles. This appeal seeks reversal of this judgment.
The dealer has not appealed but the Discount Company contends that the depositions and affidavits submitted to the trial judge show substantial conflicts on material facts as to whether the distributor actually passed title to the dealer by accepting his check in lieu of cash and issuing the "invoice-bill of sale" showing cash on delivery, and further whether the distributor had waived its rights to reclaim the automobiles as against the Discount Company by issuing the bill of sale, and finally, whether the Discount Company is a good faith purchaser for value.
Appellee seeks to sustain the judgment of the trial court with the contention that there was no genuine issue on the controlling material fact, that title never passed to the dealer because the checks were returned for insufficiency of funds and that, therefore, the floor planning arrangement never became effective.
The correctness of the ruling of the trial court must be tested by the rules applicable to the awarding of summary judgments. If there was a genuine issue on material facts, then the summary judgment should not have been awarded and the cause should have been tried in the usual course.
We dismiss the contention that the appellant was a "good faith purchaser for value" for the reason that these automobiles were obviously not acquired by the appellant in the usual course of retail trade. It is for this reason that appellant cannot receive the benefit of those decisions which protect the customer who purchases a commodity in the course of retail trade even though the merchant or dealer does not have title to the commodity sold.
The problem before us, however, involves a consideration of Chapter 673, Florida Statutes, F.S.A., known as the Uniform Trust Receipts Law, which was originally adopted in Florida as Chapter 26730, Laws of Florida 1951. So far as we are informed, this is the first time we have been called upon to consider this Act. The Act is extremely technical and a discussion of all of its aspects would unnecessarily burden this opinion. The reader is referred to the statute and explanatory references cited herein for an understanding of the scope and effect of the provisions of the statute.
In order to understand the applicability of the statute, it is necessary to consider the nature of the document executed by the dealer and delivered to the Discount Company. It is designated a "trust receipt." The Discount Company is designated "the entruster" and the dealer is called the "trustee." The trust receipt specifically provided that its terms and conditions were to be construed according to the Uniform Trust Receipts Law of Florida, Chapter 673, Florida Statutes, F.S.A. It recites that the trustee "does hereby pledge, assign, transfer and *305 sell to the entruster" the particularly described automobile. It further states that the transfer and sale "is made for the purpose of creating a security interest" in the entruster in the described automobile to secure the repayment by the trustee of the "new value" of the automobile advanced by the entruster to the trustee. The trustee agrees that he shall keep the automobile on his place of business solely for the purpose of sale or exchange in the usual course of the trustee's trade.
The trust receipt method of financing the acquisition of automobiles by dealers and the ultimate sale to purchasers in the usual course of trade has been a fairly recent development in the realm of commercial financing. Although trust receipt transactions were well known to the common law, particularly in financing the importation of goods from foreign countries, it was not until the late Twenties that it became evident that this type of financing could be of practical value in the domestic retail markets. So it was that in 1933 after years of study, the commissioners on Uniform State Laws recommended the Uniform Trust Receipts Act which has now been adopted in 32 states, plus Alaska and Puerto Rico, in substantially the same form as it exists in Florida. See Vol. 5 Fordham Law Review, p. 240, and Vol. 41 Columbia Law Review, p. 1134. Also see 1933 Handbook of the National Conference of Commissioners on Uniform State Laws, p. 241, for a detailed analysis of the reasons for the adoption of this particular Act.
Section 673.02, Florida Statutes, F.S.A., includes in the definition of trust receipt transactions the following:
"(c) The entruster gives new value in reliance upon the transfer by the trustee to such entruster of a security interest in goods or documents whether or not such goods or documents are owned or possessed by the trustee prior or subsequent to the execution of the trust receipt and whether or not such goods are thereafter retained in the trustee's possession; * * *." (Emphasis added.)
The same section of the Act requires that the "new value" given by the entruster must be against the signing and delivery by the trustee of a writing designating the goods and reciting that a "security interest" therein will remain in or will pass to the entruster. It should be noted that under this Act it is provided that at the time the trust receipt is executed by the trustee (the dealer) he is not necessarily required to be the owner or possessor of the goods in which the entruster is given the "security interest." The obvious reason for this is that one of the primary purposes of trust receipts financing authorized by the Act is to enable a retail dealer to obtain funds to purchase goods or merchandise to maintain his inventories at a satisfactory level in order to meet the demands of the retail market. This is so because it has been found that many small retailers are not able to supply their own financing in an amount sufficient to provide the inventories adequate to meet the public demand. In practice under the form of trust receipt financing followed in this case, the retailer would execute and deliver the trust receipt to the finance company which would then deliver the money to the retailer who in turn would use the money to acquire the automobile from the distributor and upon acquiring title to the automobile, it then automatically becomes subject to the "security interest" of the finance company. The automobile remains on the "floor" of the dealer who ultimately sells the car to a purchaser in the course of trade and thereupon repays the finance company either in the form of cash or by transfer of the lien papers executed by the purchaser. This is known to the trade as "floor-planning." It is for this reason that it has been said that a finance company that lends money on trust receipts of this nature assumes the risk of the borrower's dishonesty or fraud in that the borrower can sell a good title to a purchaser in good faith for value in the course of retail trade even though the automobile is encumbered by the security interest of the finance company.
With this very brief summary of the nature of trust receipt financing as applied to *306 the particular situation before us, we return to a consideration of the applicability of the Act to the case at bar. The Discount Company advanced funds to the dealer apparently on the assumption that the dealer would in the usual practice acquire title to the particular automobiles and that this title would inure to the benefit of the Discount Company and thereby subject the automobile to the security interest of the lending agency. This transaction, between Heptinstall and the appellant, would have been something of an anomaly at common law and in this state prior to the enactment of Chapter 673, Florida Statutes, F.S.A. But by the provisions of the cited Act the transaction now has a definite and legitimate legal status, which is entitled to full recognition within its proper orbit. Consequently, it now appears that if title to the vehicles reached Heptinstall, as contended by appellant, then under this Act the appellant's security interest attached to it and would give appellant a right of possession, on default at least within thirty days of the execution of the trust receipts (see Section 673.08, Florida Statutes, F.S.A.), prior in dignity to any right of appellee to recover the automobiles because of the worthless checks given in payment therefor. See 46 Am.Jur. "Sales", Sec. 446, p. 611 et seq.; also Sec. 478, p. 644.
It is, therefore, apparent that if the dealer in this case acquired title to the three automobiles, such title automatically inured to the benefit of the Discount Company. That was the question to be decided in the trial court and on this question there appears to be conflicting facts and circumstances which would justify a full trial of the cause. While the record shows that the dealer gave worthless checks to pay the purchase price to the distributor, it also contains statements indicating testimony on which a jury might have found that the distributor had accepted the checks of the dealer in payment and had delivered to the dealer an unequivocal invoice tantamount to a bill of sale as between them evidencing payment of cash on delivery. In addition there are indications on which a finding might be made that for one reason or another the distributor withheld deposit of the dealer's checks for several days and even after the checks were returned for insufficiency of funds, the distributor continued the extension of credit by re-depositing the first check and later accepting another check in lieu thereof. With all of this background the distributor in connection with the third Henry J seemingly accepted another check from the obviously hard-pressed dealer. The distributor's wholesale manager testified by deposition that when these checks were accepted the distributor considered that the dealer had the right to sell the automobiles.
It was further evident from this record that the distributor for several months was aware of the financial difficulties of this particular dealer. There was a conflict on whether the distributor was actually advised at the time of the telephone purchase that the dealer intended to "floor plan" the cars. If it should be determined as a fact that the distributor had this information when the cars were purchased by telephone, it would appear that he knowingly and willingly extended credit to the dealer or was completely indifferent to the results by transferring the cars to the dealer without evidencing in the transfer papers some retention of title until he was paid in a satisfactory manner.
From all that appears in this record on the motion for summary judgment it could be concluded that the distributor deemed himself paid in the form of the dealer's check, that he was willing to run this risk and that he transferred title to the automobiles to the dealer and assumed the risk of payment therefor knowing all the while that the dealer was hard-pressed and with information that the dealer had "floor planned" the cars. In addition there appears to be substance to the appellant's contention that even though the distributor felt that he was retaining title to these automobiles contingent on ultimate payment of the checks, there is evidence, sufficient at least to justify a full trial, to indicate that he waived such right as against the floor planning finance company by executing the unequivocal bill of sale that subsequently was exhibited to *307 the finance company as evidence of the dealer's title and as indicating that the security interest of the finance company was adequately protected by the unrestricted title transferred to the dealer. Compare Woods v. Thompson, 159 Fla. 112, 31 So.2d 62.
By the foregoing analysis of the testimony appearing in the record before us, we are not here intending to hold that upon a full trial the Discount Company appellant should necessarily be successful. We do here hold, however, that there was sufficient conflict in the material factual aspects of this case to justify a full trial either by jury or by the court without a jury. It is noted in passing that neither party has requested a jury trial.
In the subsequent consideration of this case the parties might find it helpful to refer to Metropolitan Finance Corporation of California v. Morf, Cal. App., 109 P.2d 969; Federal Building Co. v. Ford Motor Co., 101 Ind. App. 286, 199 N.E. 163; and the following Annotations in American Law Review, to-wit, 49 A.L.R. 282; 87 A.L.R. 302; 101 A.L.R. 453; and 168 A.L.R. 359.
We have not overlooked the Florida cases of Commercial Credit Corporation v. McGriff, Fla., 66 So.2d 52; and Nash Miami Motors, Inc., v. Bandel, 160 Fla. 925, 37 So.2d 366. An analysis of these cases will reveal that they furnish no precedent for the present disposition of the case before us although upon a full hearing on all of the facts they may be helpful in determining the ultimate results.
Finding, therefore, that there was substantial conflict and controversy on material factual issues justifying a full trial of the case before us, the order granting the motion for summary judgment and entering the judgment for the appellee must necessarily be reversed and the cause is remanded for further proceedings consistent with this opinion.
Reversed.
DREW, C.J., and TERRELL and HOBSON, JJ., concur.