136 So.2d 15 (1961)
UNIVERSAL C.I.T. CREDIT CORPORATION, a foreign corporation, Appellant,
v.
THURSBAY CHEVROLET COMPANY, Inc., W.E. Thursbay, Ernestine Thursbay, John H. Cannington, Nellie Cannington and David C. Gaskin, Appellees.
No. C-353.
District Court of Appeal of Florida. First District.
December 12, 1961.
Rehearing Denied January 10, 1962.
*16 Earl R. Duncan, Panama City, and Holsberry & Emmanuel, Pensacola, for appellant.
Silas R. Stone, Port St. Joe, Isler, Welch & Jones, Panama City, and David C. Gaskin, Wewahitchka, for appellees.
RAWLS, Judge.
Appellant, Universal C.I.T., which was plaintiff in the trial Court, seeks reversal of a final decree rendered by the Chancellor in favor of appellee defendants.
This cause is one of a series involving the plaintiff, Universal C.I.T. with the defendants, Thursbay Chevrolet Company, Inc., W.E. Thursbay and Ernestine M. Thursbay, resulting from the failure of the business Thursbay Chevrolet Company, Inc. Among numerous other actions were a mortgage foreclosure on the equipment and other assets of the defendant, an accounting action in which Universal C.I.T. recovered a judgment against Thursbay Chevrolet Company, Inc., W.E. Thursbay and Ernestine Thursbay in the sum of $52,417.16, and a criminal prosecution against W.E. Thursbay for theft of two automobiles, in which he was found not guilty. The case at bar involves the right of Universal C.I.T. to be subrogated to the lien of a mortgage which had covered the home of defendants, Mr. and Mrs. Cannington, father-in-law and mother-in-law of W.E. Thursbay.
On January 2, 1957, W.E. Thursbay borrowed $10,000 from Walker Liddon. The note was executed by the Thursbays and the Canningtons, endorsed by David C. Gaskin and secured by a mortgage on the Cannington's home, which was owned by tenancy in the entirety. The note was also secured by a mortgage on a lot in Port St. Joe owned by the Thursbays. The proceeds of the loan were used by W.E. Thursbay as part of the purchase price of the business, Thursbay Chevrolet Company, Inc. of which W.E. Thursbay was president and manager; his wife, Ernestine Thursbay, was secretary; and J.H. Cannington, Mrs. Thursbay's father, was vice-president.
On January 2, 1958, the due date of the mortgage, Thursbay retired same by paying Liddon $9,800 cash and a $1,000 check from David Gaskin. At the same time the Thursbays conveyed to Liddon title to the *17 lot in Port St. Joe which was also covered by the mortgage, and Liddon conveyed the same to David Gaskin for the $1,000 check. David Gaskin recorded the deed several months later and subsequently sold this lot to a third party, Jesse Stone.
On February 6, 1957, Universal C.I.T., as entruster, and Thursbay Chevrolet Company, as trustee, entered into a trust receipts financing agreement, commonly known as "floor planning." A statement of intention to engage in trust receipt financing was signed by the parties and recorded with the Secretary of State as required by F.S. Section 673.13, F.S.A. Thereafter Universal C.I.T. financed the purchase of new cars for the trustee company.
During the year of 1957, the Company began experiencing financial difficulties and in mid-December of that year Thursbay confided to J.T. Vines, a former C.I.T. employee, that he needed money to pay off a loan on the home of his father-in-law. He asked Vines what he thought C.I.T. would do if he (Thursbay) sold cars "out of trust." Vines communicated Thursbay's intentions to Owsley, C.I.T.'s manager, who caused a commodity check to be made two or three days before Christmas. There were no sales "out of trust" at this time. On January 2, 1958, Owsley found that fourteen cars had been sold "out of trust" and on January 6, 1958, plaintiff demanded an accounting.
The evidence indicates the proceeds from the sales were put in the Company safe along with other indeterminate funds belonging to the Company from sales of parts, services, etc., and indeterminate funds belonging to Thursbay individually derived from sale of his home, salary, and funds from a savings account.
The business was attached by the plaintiff, and several days thereafter Thursbay and a deputy sheriff, with the permission of all concerned, went into the Company office to get a bicycle belonging to Thursbay's son. Upon entering the premises they found the safe in a condition which indicated it had been burglarized and the contents pilfered.
Neither Mr. nor Mrs. Cannington received any benefit from the $10,000 loan but had signed the note and mortgage to help their daughter and son-in-law. The Canningtons did not pay any part of the funds used to satisfy the mortgage. Mr. Cannington, a heavy equipment operator working for the City of Panama City, was a nominal stockholder of Thursbay Chevrolet Company, Inc. but had no actual knowledge of the affairs of the corporation.
In his final decree the Chancellor found that the funds in the Company safe were hopelessly mixed and commingled; that plaintiff failed to trace any of its funds into the retirement of the mortgage; that plaintiff made no effort to disprove that the safe had been burglarized; that although plaintiff had for some time known of the unstable financial condition of the Company and had been advised Thursbay was contemplating selling vehicles "out of trust," it failed to act with due diligence to prevent the "out of trust" sales; that plaintiff cannot claim subrogation against the Port St. Joe lot because it was not conveyed to Gaskin without consideration and there was no evidence whatsoever that any of plaintiff's funds had been used in connection with the transfer; that the instant case was only one of a series of actions (with the same Judge presiding over all) involving the plaintiff and the Thursbay Chevrolet Company, Inc. and that in a separate accounting action brought by the plaintiff against the defendants, the plaintiffs recovered a judgment in the sum of $52,417.16 which in addition to a capital loan covered the identical items named in the instant suit except for the plaintiff's claimed right of subrogation. The record contains adequate evidence to sustain the Chancellor's findings.
Additional litigation involving the "out of trust" sales of the fourteen cars was brought by Universal C.I.T. against the purchasers on the theory that they were *18 not bona fide purchasers as contemplated by the Uniform Trust Receipts Act.[1] One case, Universal C.I.T. v. Beland, 112 So.2d 78 (Fla.App. 1959), involving three of the automobiles, was appealed from a judgment in favor of the purchasers from the Court of Record, Escambia County, to this Court, which affirmed the lower Court. Another action involving two of the fourteen automobiles was instituted by Universal C.I.T. against the purchaser, C.V. Blue, in the United States District Court for the Northern District of Florida, and the Court's decision in that cause was in favor of the purchaser. Universal C.I.T. attempted to sue one Gilbert A. Bean for another two of the fourteen automobiles, but declined to pursue this purchaser since he had moved out of the state. It was successful in recovering two of the fourteen automobiles. Therefore, the record clearly shows that Universal C.I.T. aggressively pursued the "res" that is the subject of the instant cause and appellee urges that this constituted an election of remedies to the prejudice of Universal C.I.T. in this cause. Appellee's position, that Universal C.I.T. cannot pursue the "res" and concurrently claim the proceeds of the "res" i.e. "have its cake and eat it," appears to have merit; however, in view of our conclusions herein, it is not necessary to pass upon this question.
Universal C.I.T. contends that under the foregoing facts, it is entitled to the funds paid to Liddon with Liddon's mortgage being reinstated, or in the alternative, to have the satisfaction cancelled, the mortgage reinstated and C.I.T. subrogated to Liddon's rights thereunder. To be entitled to subrogation under the general law, Universal C.I.T. must clearly identify the proceeds from the "out of trust" sales and trace same into the payment of the mortgage.[2] This it failed to do, therefore, its claim of subrogation rests upon its rights in accordance with the provisions of Chapter 673, F.S., 1959 F.S.A., entitled "Uniform Trust Receipts Law," and in particular Section 10 of said Act.[3]
Universal C.I.T. maintains that under paragraph (b) of Section 673.10, F.S., F.S.A., it, as entruster, has a right to impress its trust upon the moneys paid Liddon without tracing same. Although transactions within the scope of the Uniform Trust Receipts Act would have been an anomaly at common law and in this State prior to the enactment of Chapter 673, F.S. 1959, F.S.A., such transactions now have a definite and legitimate legal status, which is entitled to full recognition within its proper orbit.[4] It is, therefore, necessary to determine if Universal C.I.T. has within the proper orbit of the Act, any rights of subrogation.
*19 Seemingly, this question has not arisen nor been decided in any jurisdiction construing the Uniform Trust Receipts Act. The limited number of cases construing Section 10 of the Act have dealt with the general assets of the trustee, which in this case is Thursbay Chevrolet Co., Inc. Counsel has not cited and we have not found any case construing the Trust Receipts Act where the entrusted property has been converted into cash, commingled with personal assets of the management of trustee, and subsequently expended outside the orbit of the trustee's business, as in this case.
Universal C.I.T. relies heavily upon a decision rendered by the United States District Court, M.D.Tenn., In re Harpeth Motors, 135 F. Supp. 863 (1955), which construed Section 10 of the Tennessee Uniform Trust Receipts Act, 1950 Code Supp. § 7792.11, a provision identical to Section 673.10 of the Florida Act, F.S.A. The Court was concerned in that case with the rights of entruster to the assets of a bankrupt trustee, and held that Section 10 gave the entruster a lien claim on trustee's assets for the value of unidentifiable proceeds. Though the decision in that case is not the best nor latest expression of the legal status of the entruster's security interest, we do concur with the following statements found on page 867:
"It is apparent that the phrases `to the extent to which' and `all classes of persons' refer to the other provisions of the Act defining the classes of persons as to whom the entruster's security interest is valid and enforceable, as well as those provisions defining the scope of the security interest. As observed above, where filing has been made with the Secretary of State, the classes of persons as to whom the entruster's security interest is valid, include (a) general creditors of the trustee, (b) subsequent purchasers other than purchasers in the ordinary course of trade, and (c) subsequent lien creditors whether their liens are acquired by attachment, levy, or by any other similar operation of law or judicial process.
"* * * The right to receive the `value' derived from the sale or disposition of entrusted goods necessarily contemplates payment of such value out of the general assets of the trustee." (Emphasis supplied.)
In a subsequent case, which is the latest decision on the subject,[5] the United States Court of Appeals, Seventh Circuit, refused to follow the Harpeth decision, and found that the object of Section 10 of the Illinois Trust Receipts Act, Ill. Rev. Stat. 1957, c. 121 1/2, § 175 (which was identical to the Florida and Tennessee provision) was to give to the entruster a priority in the general assets of the trustee ahead of the general creditors and not a lien. The conclusion reached in this case was based upon sound reasoning which is tersely stated on page 226:
"Thus the object to be attained by § 10 of the Illinois Trust Receipts Act was to give to the entruster a priority ahead of general creditors upon insolvency of the trustee. Nothing more was necessary. Nothing more was contemplated. The legislative intent is crystal clear.
"When the legislature provided in § 10 that the entruster was entitled, on the insolvency of the trustee, `to a priority to the amount of' the proceeds from the goods or the value thereof it meant exactly what it said, i.e., priority. A cursory examination of the entire Act clearly illustrates that when the legislature intended to mean lien the word `lien' was used. Thus, had it intended to create a lien on the general assets of the insolvent to the exclusion of the costs of administration as well *20 as the general creditors, it certainly would not have used the word `priority'."
All cases which we have found on this subject, including all those cited by counsel, have dealt with the priority of the entruster as against the general assets of the trustee; and in no case have we found the language of the act construed to extend the entruster's priority to unidentifiable funds which have left the hands of the trustee without adequate tracing and positive identification. It is our opinion that although the persons affected here, the Canningtons, Walter Liddon, and David Gaskin, are not bona fide purchasers of the entrusted goods, neither can they come within any of the "classes of persons" as to whom the security interest is valid nor could the funds here in litigation be now considered general assets of the trustee, Thursbay Chevrolet Co., Inc.
Our view is further supported by the Commissioners' Prefatory Note in Uniform Laws Annotated, Vol. 9C, pages 220-230. Pertinent to this opinion is the explanation on page 225 as to what Section 10(b) does for the entruster:
"In the event of the trustee's insolvency, it simplifies the proof in administration proceedings by allowing a preference for any proceeds of released security which have been received by the trustee within 10 days, so far as the trustee was under a duty to account for such proceeds."
As to the entruster's right of subrogation, the note states:
"While protecting a bona fide purchaser of goods, documents, or instruments, entrusted (Sec. 9), the Act subrogates the entruster to any debt owing from the purchaser by reason of such purchase."
and as to the general theory, page 224:
"The act proceeds on the theory that the entruster in such case is entitled to protection only against honest insolvency of the trustee. Dishonest action of the trustee is a credit risk and bona fide purchasers are to be protected against the entruster who has taken the risk by entrusting." (Emphasis supplied.)
Furthermore, the Act itself dispels any claim that a trust in the usual sense was created or that the trustee had any rights, obligations or duties not provided therein. Section 673.01(14) F.S., 1959, F.S.A., states: "The use of the word `trustee' herein shall not be interpreted or construed to imply the existence of a trust or any right or duty of a trustee in the sense of equity jurisprudence other than as provided by this chapter."
In arriving at our decision we were cognizant of F.S. Section 673.10(c), F.S.A. which preserves to the entruster its common law rights to traceable proceeds, but here again the proceeds must be clearly identifiable. In considering the Act as a whole, the decisions construing the Act, and the comments of the framers of the Act, we find it silent as to the theory of Universal C.I.T. and it is not for this Court to read something into it which clearly was not contemplated by the framers.
The next question involves the propriety of the conveyance by the Thursbays of the Gulf County lot to Walker Liddon in payment of the remaining $1,000 due on the mortgage. Universal C.I.T. insists that this is a fraudulent conveyance within the purview of § 726.01 F.S., 1959, F.S.A., and that the Chancellor erred in not specifically passing upon this question in his final decree. The Chancellor found that plaintiff failed to sustain its allegations that the Gulf County lot described in the complaint was conveyed to David C. Gaskin without consideration, which finding clearly reveals that the Chancellor considered the question and disposed of same adversely to the contentions of Universal C.I.T. The record contains competent evidence reflecting *21 that the conveyance did not come within purview of § 726.01 F.S., 1959, F.S.A.[6]
We find no merit in the other points raised by Universal C.I.T.; accordingly, the decree is affirmed.
CARROLL, DONALD, C.J., and WIGGINTON, J., concur.
NOTES
[1] Chapter 673, F.S., 1959, F.S.A.
[2] First State Trust & Savings Bank v. Therrell, 103 Fla. 1136, 138 So. 733 (1932).
[3] F.S. § 673.10, F.S.A. "Where, under the terms of the trust receipt transaction, the trustee has no liberty of sale or other disposition, or, having liberty of sale or other disposition, is to account to the entruster for the proceeds of any disposition of the goods, documents or instruments, the entruster shall be entitled, to the extent to which and as against all classes of persons as to whom his security interest was valid at the time of disposition by the trustee, as follows:

"(a) To the debts described in § 673.09(3); and also
"(b) To any proceeds or the value of any proceeds (whether such proceeds are identifiable or not) of the goods, documents or instruments, if said proceeds were received by the trustee within ten days prior to either application for appointment of a receiver of the trustee, or the filing of a petition in bankruptcy or judicial insolvency proceedings by or against the trustee, or demand made by the entruster for prompt accounting; and to a priority to the amount of such proceeds or value; and also
"(c) To any other proceeds of the goods, documents or instruments which are identifiable, unless the provision for accounting has been waived by the entruster by words or conduct; and knowledge by the entruster of the existence of proceeds, without demand for accounting made within ten days from such knowledge, shall be deemed such a waiver."
[4] Volusia Discount Company v. Alexander K-F Motors, 88 So.2d 302 (Fla. 1946).
[5] In re Crosstown Motors, Inc., (7 Cir., 1960), 272 F.2d 224, certiorari denied Commercial Credit Corp. v. Allen, 80 S.Ct. 1246, 363 U.S. 811, 4 L.Ed.2d 1152.
[6] Nelson v. Cravero Constructors, Inc., 117 So.2d 764 (Fla.App. 1960).